# UNITED STATES DISTRICT COURT

## for the

# WESTERN DISTRICT OF WISCONSIN

REMUS JOHNSON,
and
BROOKE JOHNSON-PAQUETTE,

       *Plaintiffs,*

vs.                                                                    Case No. 23-CV-761

                                        **<u>DEMAND FOR JURY TRIAL</u>**

SCHOOL DIST. of RHINELANDER
BOARD OF EDUCATION and ERIC
BURKE in his official capacity as Superintendent
of the School District of Rhinelander,

       *Defendants.*

---

## **PLAINTIFFS FIRST AMENDED COMPLAINT**

---

## I.      INTRODUCTION

1.      Plaintiff Remus recently turned 18-years-old and is a nonbinary individual who
attended Rhinelander High School in the School District of Rhinelander in Rhinelander,
Wisconsin.  Remus was assumed to be a girl when they were born but has long identified
as a nonbinary individual using "they/them" pronouns.  Remus' family, friends, medical
providers, and others recognize Remus as a nonbinary individual, respect their gender
identity, and support their right to live and be treated consistent with that gender
identity.

2.      Plaintiff Brooke Johnson-Paquette is the mother and legal guardian of Plaintiff
Remus.  At all times relevant to the facts contained in this Complaint, Plaintiff Brooke

was an advocate for her child, Remus, and transported Remus to doctors appointments, therapy treatments, and between their residence and school.

3. Defendants School District of Rhinelander Board of Education (the "board"), Superintendent Erick Burke, and their agents, employees, and representatives, have repeatedly refused to recognize or respect Remus' gender identity and have taken a series of discriminatory and highly stigmatizing actions against them based on their sex, gender identity, and nonbinary status. The actions, as described more fully herein, have included (a) denying Remus equal access to restrooms at school and requiring them to use a single-occupancy restroom; (b) intentionally and repeatedly using their birth name and incorrect pronouns, and failing to appropriately inform substitute teachers and other staff members of their preferred name and pronouns, resulting in those staff referring to Remus by their birth name or incorrect pronouns in front of other students; (c) ignoring Remus' complaints of multiple incidents of sex-based harassment due to their gender identity and labeling student-on-student harassment as "peer harassment" instead of the proper designation of sex-based harassment; (d) failing to investigate or document the sex-based discrimination and harassment experienced, and reported to staff, by Remus; (e) failing to provide equal access to educational opportunities by denying Remus access to in-person class instruction, and instead forcing Remus to utilize online self-directed learning materials; (f) violating school district policies on reporting, investigating, and documenting sex-based discrimination occurring within the school district; (g) failing to train employees on district policies and procedures related to nondiscrimination policies and; (h) failing to involve the district's Title IX Coordinator in nearly all the sex-based harassment experienced and reported by Remus.

4. Through these actions, Defendants have discriminated against Remus on the basis of sex, including on the basis of their gender identity, nonbinary status, and

nonconformity to sex-based stereotypes, in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, *et seq*.

5.    Defendants' actions have denied Remus full and equal access to the School District of Rhinelander's education program and activities on the basis of Remus' nonbinary identity and sex.

6.    Plaintiffs bring this action against Defendants based on these unlawful and discriminatory actions.

7.    Plaintiffs seeks a declaratory judgment and damages resulting from the Defendants' discriminatory actions.

## II.    JURISDICTION AND VENUE

8.    This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343(a)(3), and is authorized to order declaratory relief under 28 U.S.C. §§ 2201 and 2202.

9.    Venue is proper in the Western District of Wisconsin under 28 U.S.C. § 1391(b) because the claims arose in the District, the parties reside in the District, and all of the events giving rise to this action occurred in the District.

## III.    PARTIES

*The Plaintiff*

10.    Plaintiff Remus Johnson is an 18-year-old nonbinary individual, born January 26, 2006, and a resident of the State of Wisconsin, currently residing at 5605 Camp Phillips Rd, Weston, WI 54476.

11.     Plaintiff Brooke Johnson-Paquette is Remus' mother.  Brooke currently resides at 5605 Camp Phillips Rd, Weston, WI 54476.  Brooke and Remus previously resided in Rhinelander, Wisconsin, but due to the discrimination experienced by Defendants had no choice but to move for their safety.

*The Defendants*

12.     Defendant School Dist. Of Rhinelander Board of Education is a nine-member elected body responsible for governing the School District of Rhinelander, a public school district serving nine surrounding townships and the City of Rhinelander.  The District serves approximately 2,300 students in its four elementary schools, middle school, and high school.  The Board derives its authority to govern the district directly from the Wisconsin Constitution and state statutes.  The school district is a recipient of federal funds from the U.S. Department of Education and the U.S. Department of Health and Human Services, and, as such, is subject to Title IX of the Education Amendments of 1972, which prohibits sex discrimination against any person in any education program or activity receiving Federal financial assistance.  The Board designates responsibility for the administration of the School District of Rhinelander to its Superintendent of Schools, currently Eric Burke, who oversees a number of school administrators, principals, and assistant principals.  The Board is vicariously liable for the acts or omissions of its employees, agents, and representatives, including those of the other Defendant Burke and other school administrators, staff, and volunteers.

13.     Defendant Eric Burke is the Superintendent of the School District of Rhinelander and is sued in his official capacity.  At all times relevant to the events described herein, Burke acted within the scope of his employment as an employee, agent, and representative of the Board.  In such capacity, he carried out the discriminatory practices described herein (a) at the direction of, and with the consent, encouragement, knowledge, and ratification of the Board; (b) under

the Board's authority, control, and supervision; and (c) with the actual or apparent authority of the Board.

### IV.     ALLEGATIONS OF FACT AS TO ALL CAUSES OF ACTION
#### *Gender Identity and Gender Dysphoria*

14.     Sex is a characteristic that is made up of multiple factors, including hormones, external physical features, internal reproductive organs, chromosomes, and gender identity.

15.     Gender identity, a person's deeply felt understanding of their own gender, is the determining factor of a person's sex.  Gender identity is often established as early as two or three years of age, though a person's recognition of their gender identity can emerge at any time. There is a medical consensus that efforts to change a person's gender identity are ineffective, unethical, and harmful.  A person's gender identity may be different from or the same as the person's sex assigned at birth.

16.     The phrase "sex assigned at birth" refers to the sex designation recorded on an infant's birth certificate.  For most people, gender identity aligns with the person's sex assigned at birth, a determination generally based solely on the appearance of a baby's external genitalia at birth. For transgender or nonbinary people, however, the gender they were assumed to be at birth does not align with their gender identity.

17.     Gender Dysphoria is a condition recognized by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 5th edition ("DSM-5").  It refers to clinically significant distress that can result when a person's gender identity differs from the person's assumed gender at birth.  If left untreated, Gender Dysphoria may result in profound psychological distress, anxiety, depression, and even self-harm or suicidal ideation.

18.     Treatment for Gender Dysphoria is usually pursuant to the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People ("Standards of Care"),

published by the World Professional Association for Transgender Health ("WPATH") since 1980. WPATH is an international, multidisciplinary, professional association of medical providers, mental health providers, researchers, and others, with a mission of promoting evidence-based care and research for transgender health, including the treatment of Gender Dysphoria. WPATH published the eighth and most recent edition of the Standards of Care in 2022.

19.     Consistent with the WPATH Standards of Care, treatment for Gender Dysphoria consists of the person "transitioning" to living and being accepted by others as the sex corresponding to the person's gender identity. A key stage in that process is a "social transition," in which the individual lives in accordance with his/her/their gender identity in all aspects of life. A social transition, though specific to each person, typically includes adopting a new first name, using and asking others to use pronouns reflecting the individual's true gender, wearing clothing typically associated with that gender, and using sex-specific facilities corresponding to that gender. Failing to recognize or respect a transgender or gender nonconforming person's gender is contrary to established medical protocols and can exacerbate an individual's symptoms of Gender Dysphoria.

20.     Medical treatments, such as hormone therapy or surgical procedures, may also be undertaken to facilitate transition and alleviate dysphoria, typically after an individual's social transition. Under WPATH Standards of Care, living full-time in accordance with one's gender identity in all aspects of life for at least one year is a prerequisite for any medical interventions. Medical treatments are also not necessary or appropriate in all cases.

21.     A social transition requires that a gender nonconforming (or nonbinary) individual be recognized and treated the same as all other children by parents, teachers, classmates, and others in the community. This includes being referred to exclusively with the student's new

name and pronouns, being permitted to use the appropriate restrooms and school spaces, classrooms, educational facilities, and extra-curricular activities as other students. Singling out a nonbinary student and treating them differently than other students communicates the stigmatizing message to that student and the entire school community that they should not be recognized or treated as nonbinary, simply because of their gender identity. This undermines the social transition and exposes the student to the risk of renewed and heightened symptoms of Gender Dysphoria such as anxiety and depression. It also frequently leads nonbinary and transgendered students to avoid using school restrooms altogether, often resulting in adverse physical health consequences such as urinary tract infections, kidney infections, and dehydration, and other consequences such as stress and difficulty focusing on classwork.

### *Plaintiff's Background*

22.    Remus' pediatric doctor, Eunice Corujo-Incha, was their doctor since birth. In 2018, Doctor Corujo-Incha diagnosed Remus with gender dysphoria, continued to provide medical care for Remus, and worked on referrals for therapy and other treatments related to gender dysphoria.

23.    Remus has been a student in Rhinelander schools since the 2018-2019 school year (7th grade). Remus is a great student, which is evident by recently graduating high school early by taking additional courses through DC Everest. The accelerated graduation, however, was driven by the trauma, harassment, and heightened Gender Dysphoria symptoms experienced while attending Rhinelander High School, and at the expense of enjoying what would be considered a complete/full high school experience.

24.    Remus is a nonbinary individual. Remus was designated "female" on their birth certificate and lived as a girl through approximately 2016/2017, when they realized that they

were, in fact, gender nonconforming and began to experience profound discomfort with being assumed to be a girl by others.

25.    During this time period, 2017-2018, Remus continued to see their pediatric doctor, Eunice Corujo-Incha.  These visits for routine care resulted in a diagnosis of gender dysphoria, and Doctor Corujo-Incha began to assist with referrals for therapy related to gender dysphoria.

26.    Remus had informed the School District of Rhinelander that they had transitioned in approximately the 2018-2019 school year, informing the district of their changed name and pronouns at this time.

27.    Remus faced numerous incidents of sex-based discrimination during these, and following years, at school from teachers and other students.  This discrimination led to increased social anxiety, stress, fear, and ultimately, a suicide attempt.

28.    During the 2018-2019 school year, Remus was bullied by many groups of students.  One situation escalated to a point where Remus was forced to report the harassment to the school liaison officer.  Remus is unaware of any documentation, investigation, or actions taken with respect to this harassment.

29.    Additional harassment during the 2018-2019 school year occurred while Remus was either walking to school from the school bus or as they left school and headed towards the bus.  Such harassment occurred in the presence of school faculty, and included shouts of derogatory slurs such as "dyke," "girl-boy," "what are you?," "freak," towards Remus as well as students crowding around Remus asking "if I was a dyke."

30.    Also, during the 2018-2019 school year, a teacher named Neil Rumney often targeted and sought out to harass Remus.  Mr. Rumney was not a teacher for Remus' class, rather his position was to assist students with learning struggles.  Mr. Rumney would go out of his way to

interact with Remus, often referring to Remus as "ma'am" or "Ms." intentionally utilizing incorrect pronouns. After Remus would confront Mr. Rumney about using incorrect pronouns, he would "smirk" and say words to the effect of "I guess I shouldn't be calling you that."

31.     The actions of Mr. Rumney towards Remus were reported, yet they continued throughout the school year, both in the hallways of the school and in classes where he was assisting other students.

32.     In 2019, Remus was forced to drop out of their physical education class. This was suggested to Remus due to repeated harassment from students which Remus reported. Plaintiff is unsure if the reported harassment was investigated or documented by any staff.

33.     Remus specifically recalls reporting repeated harassment by a student known to Plaintiff as "Owen" to the school staff. After reporting this harassment, no actions were taken to separate Remus and "Owen" in their classes and the harassment continued.

34.     Examples of the harassment included specific students targeting Remus with derogatory slurs such as "dyke," "girl-boy," and other taunting while in the women's changing room.

35.     Remus also informed their physical education teacher that they were uncomfortable when classes were split into "boys and girls" as they were often harassed by each group of students due to their gender identity. The teacher responded by continuing to separate the class into groups of "boys and girls" and allowing the name-calling and other harassment to continue.

36.     After months into their second year at this school, Remus was permitted only to use the nurse's restroom for changing after physical education. This restroom was commonly being used by sick students and often resulted in students asking why Remus was using this restroom.

37.     In December 2019, Remus began online schooling due to the bullying and worsening mental health.  The school district recommended this online schooling as the only solution to the continued harassment suffered by Remus from students and some staff members.

38.     Online schooling led to feelings of isolation and worsening mental health, so Remus returned to in-person education in 2020.

39.     When Remus returned to school, the bullying by students continued.  Remus would report the harassment to staff but does not recall any follow-up related to their reports. Harassment consisted of derogatory slurs such as "dyke" and "girl-boy," and other names related to Remus' nonbinary identity, and these slurs were often communicated to Remus in the presence of school staff.

40.     In mid-2020, Remus' mental state from the harassment resulted in suicidal ideations and eating disorders.

41.     Remus sought medical treatment through hospitalization/in-patient care through Rogers Behavioral Health in the summer of 2021 and other medical care through psychologists, medical doctors, therapists, etc.  Remus has been seeking care since 2017, and the actions of the District, District Staff, and students exacerbated their mental anguish ultimately resulting in a suicide attempt.  This medical care has caused a great financial burden on their family.

42.     In October 2021, Remus returned to full-time in-person instruction at the District's high school.  The day before Remus returned, the Associate Principal emailed all of their teachers to notify them that Remus would be returning to in-person learning and informed the teachers of Remus' preferred pronouns and of Remus' name which was different than the name identified in their official school record.

43.     The District's Administrative Guide 2266: *Student Gender Support* was adopted by the School Board on September 1, 2021, and states that the District will use identity-affirming names and pronouns, unless otherwise required by law.

44.     Within days of Remus' return to school, they experienced multiple incidents of sex-based harassment and discrimination due to their gender identity, including being misgendered by teachers as well as students, and physically and emotionally assaulted by students in class and within the hallways of the high school.

45.     Remus had items stolen, photographs taken without permission, and derogatory slurs from students while in the classrooms of the District.

### District's Refusal to Permit Access to Restrooms

46.     While attending in-person schooling at Rhinelander high school, Remus was permitted only to use one bathroom, located on the first floor away from areas utilized for classroom instruction.

47.     This option offered by Defendants was discriminatory, burdensome, or unworkable. Remus was distressed as this further isolated them while at school and interfered with their social transition.  The restroom was also far out of the way from most of their classes, and only used by office staff and visitors.  It is Remus' understanding that no other students are allowed to use this restroom and feared the questions they would face from students and staff about why they were using that particular restroom; the inconvenience of traveling long distances from (and missing time in) their classes to use that restroom; and the fact that they would be segregated from classmates and further stigmatized for being "different."

48.     This treatment exacerbated the symptoms associated with Gender Dysphoria, including depression, anxiety, and suicidal thoughts.

49.     Remus, after seeing no end in sight to the harassment they were suffering, and after receiving no help from district administration or teachers, and after a failed suicide attempt, confided in their mother that the harassment was not stopping.

50.     Brooke took this information and filed a complaint with the Department of Education Office of Civil Rights ("OCR"), who investigated the matter as OCR Case No. 05-22-1029. (attached to the complaint as Plaintiffs Ex. 1).

51.     OCR interviewed the districts Title IX Coordinator, the high school's Associate Principal, and two high school teachers.  OCR identified several concerns that were settled with the district through a resolution agreement.

52.     The district has not changed Remus' name on their official records and other documents, including classroom attendance rosters used by teachers.  Although most of Remus' teachers refer to them by their preferred name and pronouns, some teachers have frequently referred to them by their birth name in front of their classmates.  At least one staff member, Mr. Rumney, would make snide comments to Remus regarding their name intentionally using "Ms." or "ma'am."

53.     The Districts Administrative Guide 2266: *Student Gender Support* was adopted by the School Board on September 1, 2021.  Yet, months later, Remus' records had not been updated using their identity-affirming names and pronouns.

54.     In an attempt to avoid embarrassment or discomfort from their classmates, Remus has been compelled to approach all of their teachers at the beginning of each term to advise them of their preferred name and pronouns and request that the teachers do not refer to them by their birth name.  Being called by their birth name, Remus was further embarrassed, distressed, and

singled out when they needed to correct the teacher. This practice resulted in Remus experiencing increased symptoms of Gender Dysphoria, including anxiety, depression, and suicidal ideations.

55.     Other students would often single out Remus in peer-to-peer sex-based discrimination and harassment.

56.     Students during class would state "girl/boy" and "there is no such thing besides two genders."

57.     One student was caught, by Remus, attempting to take photographs of Remus without permission.  Remus immediately reported this conduct to the study hall teacher, who reported the incident to the Associate Principal.

58.     After this incident, no information was passed to the district's Title IX coordinator, and the district could not provide documentation to OCR that any recorded documentation about this incident existed or that it was investigated, in violation of the district's policies.

59.     Another incident on approximately October 22, 2021, a male student "bumped" into Remus in the hallway and used a derogatory term ("faggot") toward Remus.  This incident was immediately reported by Remus to the School Principal who reviewed video footage of the incident.

60.     The principal met with the male student who admitted to engaging in the conduct.  This incident was documented as "peer mistreatment" and not sex-based harassment in the school records.

61.     This was the only incident for which the District provided documentation to OCR, however, District staff did not complete harassment checklists for the incident.

62.     In fact, the District did not involve their Title IX Coordinator in any incident prior to receiving the OCR complaint.  The Title IX Coordinator was even unaware of some incidents of harassment at the time of her OCR interview.

63.     The OCR investigation found that the District did not prominently display the Title IX Coordinator's contact information on its website or in its publications as required by the Title IX implementing regulation.

64.     The OCR investigation found another teacher could not even describe what type of conduct is prohibited by the District's nondiscrimination policies, and another denied having an obligation to report any behavior or incidents to an administrator.

65.     The OCR investigation concluded that OCR has concerns that the District is not adequately documenting or tracking incidents of sex-based harassment which could create a hostile learning environment.

66.     This hostile learning environment is what Remus was forced to endure for years, and the school's solution to it was to remove Remus from in-person education.

67.     OCR continued in their report that they were concerned that the District staff are not investigating, responding to and documenting reports of sex-based harassment, in a prompt manner that is not deliberately indifferent in response to notice of sex-based harassment.

68.     Remus repeatedly experienced the deliberately indifferent and unreasonable response from the District to their reports of harassment.  Examples include non-investigated reports of harassment, such as harassment to and from the school entrance, harassment by a student known to Plaintiff as "Owen," large groups of students shouting derogatory slurs towards Remus in front of staff as they left for the bus, students crowding around Remus asking them "if I was a dyke," and students taking photos of Remus during classes.

69.     OCR was also concerned that the District response to discriminatory harassment was to further burden the harassed student, in this case, Remus.

70.     Such burden identified by OCR can be seen through multiple meetings wherein Brooke and Remus took it upon themselves to meet with staff and administrators from the District to attempt to prevent further harassment at the beginning of each school year.  Brooke and Remus' suggestions were not implemented, and the harassment continued.

71.     Although some incidents of harassment may have been investigated by the District, OCR had concerns that the District did not adequately document, track, or investigate some other incidents of harassment which were reported to the District by Remus.

72.     Unfortunately, the District's "solution" to address the harassment and discrimination suffered by Remus was to force Remus to attend **only three** in-person classes and conduct the rest of the instruction virtually.  In essence, the District was further burdening Plaintiffs by removing Remus from nearly all in-person academic instruction.

73.     This "solution" forced Remus to be further isolated from their peers, caused significant transportation issues getting to and from school, and significantly increased the symptoms of Gender Dysphoria including anxiety, depression, and suicidal ideations.

74.     The "solution" of removing Remus from their in-person education is unreasonable and unduly burdensome on Plaintiffs.

75.     Brooke, as well, had to change her work schedule to accommodate picking up and dropping off Remus at school and at home, and then taking time off of work to care for Remus during their virtual instruction periods.

76.     Outside of the OCR investigation, Remus also was not allowed to participate in gym class (physical education) and a culinary class as the teachers felt they could not protect Remus from the ongoing harassment from students which they were now aware of.

77.     Fearing for the safety of Remus, Brooke decided to sell their house, transfer within her occupation, and move across country in an attempt to find a suitable school which would not discriminate against Remus.  This cross-country move turned out to be too much for their family due to the living conditions and safety concerns, so they again relocated to Wisconsin.

78.     Brooke was able to be re-hired at her former employer, albeit on a different route, and has lost significant wages as a result of moving for her family's safety.

79.     The actions of the District, District Staff, and students caused a significant financial loss to Remus' family, as well as extreme stress, anxiety, and fear.

### *Injury to Plaintiff*

80.     Through their actions described above, Defendants have injured Plaintiff.

81.     Defendants have denied Remus full and equal access to the School District of Rhinelander's education programs and activities by denying Remus the full and equal access to student restrooms and by denying Remus access to full in-person education as provided to other students.

82.     Remus has experienced the harmful effects of being segregated from, and treated differently than, their gender conforming classmates at school and during school sponsored events, including lowered self-esteem, embarrassment, social isolation, as well as heightened symptoms of Gender Dysphoria, including depression, anxiety, and suicidal ideations.

83.     When school administrators and staff intentionally used Remus' birth name and incorrect pronouns (or allowed others to do so), instructed Remus not to attend in-person educational courses, and otherwise undermined their nonbinary identity and singled them out as different from other students, Remus has felt deeply hurt, disrespected, humiliated, fearful, and suicidal.

84.     Defendants' discriminatory actions have led to a host of emotional trauma, for which Remus has been, and currently is, seeking therapy.  The isolation forced upon Remus caused anxiety, depression, and a suicide attempt which required life-saving medical intervention and in-patient care at great expense to Plaintiffs.

85.     To this day, Remus and Brooke cannot understand why the students who were harassing Remus were allowed to continue with their education in-person, yet Remus was forced to modify their schedule and conduct self-paced virtual lessons.  This virtual training also forced Brooke to modify her work schedule and caused great anxiety, monetary loss, and stress for their family.

86.     As a result of Defendants' actions, and the feelings of fear and scrutiny Remus has grown used to, they now feel unsafe being outside of the house, afraid that they will be targeted for an assault by someone who knows they are nonbinary, and further isolated Remus for years greatly escalating they symptoms of depression and anxiety.

87.     All of the above discriminatory treatment has undermined the efficacy of the social transition component of Remus' social transition and heightened symptoms of Gender Dysphoria.

## V.     VIOLATIONS OF LAW

### FIRST CAUSE OF ACTION

## VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. §1681 ET SEQ.

88.     Plaintiff realleges and incorporates herein the facts and allegations contained in the above paragraphs.

89.     Under Title IX and its implementing regulations, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. §1681(a); *see also* 34 C.F.R. §106.31 (Department of Education Title IX regulations); 45 C.F.R. § 86.31 (Department of Health and Human Services Title IX regulations).  Title IX's prohibitions on sex discrimination extend to "any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient" of federal funding.  34 C.F.R. §106.31; 45 C.F.R. §86.31

90.     Title IX's prohibition on discrimination "on the basis of sex" encompasses discrimination based on an individual's gender identity, transgender status, and gender expression, including nonconformity to sex-or gender-based stereotypes.

91.     Conduct specifically prohibited under Title IX includes, *inter alia*, treating one person differently from another in determining whether such person satisfies any requirement or condition for the provision of such aid, benefit, or service; providing different aid, benefits or services in a different manner; denying any person any such aid benefit, or service; or otherwise subjecting any person to separate or different rules of behavior, sanctions, or other treatment. 34 C.F.R. §106.31; 45 C.F.R. §86.31.

92.     As a Federal funding recipient, Defendant School District of Rhinelander Board of Education, including the academic, extracurricular, and other educational opportunities provided by the School District of Rhinelander and Rhinelander High School, is subject to Title IX's prohibitions on sex- and gender-based discrimination against any student.

93.     As set forth above, Defendants, by denying equal access to restrooms at school, and prohibiting Remus from in-person education for all but 3 courses have discriminated against Plaintiff in their enjoyment of the school districts education program and activities by treating Remus differently from other students based upon their gender identity, the fact that they are nonbinary, and their nonconformity to gendered stereotypes, and thereby denying them the full and equal participation in, benefits of, and right to be free from discrimination in the educational opportunities offered by the School District of Rhinelander and Rhinelander High School on the basis of sex, in violation of Title IX.

94.     Defendants have further violated Title IX by failing to recognize fully and respect Plaintiff, a nonbinary individual, as such, including through administrators' repeated and intentional use of Remus' birth name and female pronouns to address them and when speaking about them to others; the failure to take necessary and appropriate action to update or modify Remus' official and/or informal student records, including classroom attendance rosters, to prevent teachers, substitute teachers, and other school staff from referring to them by their birth name and female pronouns in the presence of other students, and by failing to follow investigative, reporting, and documentation requirements of the sex based discrimination and mistreatment when incidents were reported to teachers, administrators, and other staff. Through these actions, individually and collectively, Defendants have excluded Plaintiff from participation in, deny them the benefits of, and subject them to discrimination in the School District of Rhinelander's education programs and activities, on the basis of sex, in violation of Title IX.

95.     Plaintiff has been injured by Defendants' discriminatory conduct and has suffered extreme emotional and financial damages as a result.

## VI.     DEMAND FOR JURY TRIAL

96. Plaintiff respectfully demands a trial by jury on all claims and causes of action properly asserted in this complaint.

## VII.   CONDITIONS PRECEDENT

97. All conditions precedent to this action, within the meaning of Rule 9(c), Fed. R. Civ. Pro., have occurred or been performed.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgement as follows:

98. A judgment against Defendants for actual and consequential damages sustained;

99. Recovery of costs and expenses related to investigating and litigating Defendants' conduct;

100. Recovery of reasonable attorney fees;

101. An award of any further relief the Court deems just and proper considering the circumstances of this matter.

Dated March 14, 2024.

Respectfully submitted,

**Levine Eisberner LLC**
By: Atty. Brent G. Eisberner
2802 Coho St, Ste. 201
Madison, WI
brent@leattys.com
(Office) 608-621-2888

(Facsimile) 608-268-8607

_____

Atty. Brent G. Eisberner
Wisconsin Bar Number: 1098038

*Attorney for Plaintiffs*